**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC. | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No.: 8:21-cv-02413-MJM |
| | : | |
| TABAK, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY**
**<u>PLAINTIFF PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.</u>**

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................... 1

II.  LEGAL BACKGROUND ...................................................................................... 2

III.  PROCEDURAL HISTORY..................................................................................... 2

    A.  The Pleadings and Defendants' Dismissal Motion. ..................................... 2

    B.  Plaintiff's Motion to Supplement the Administrative Record..................... 4

IV.  UNDISPUTED FACTS .......................................................................................... 4

    A.  Facts Defendants Admitted in the Amended Answer Confirm the Seriousness of Sepsis and that Sepsis Can Be Researched Using Non-animal Methods.................... 4

    B.  Plaintiff's Supplement to the AR: The Declaration of Dr. Nielsen Provides Explanatory Material Confirming the Subject Experiments Are Neither Translational nor Harmless for the Animals. ...................................................................... 5

        i.  Duty of Peer Reviewers to Avoid Conclusory Reasoning ................................ 6

        ii.  Types of Medical Research Generally .................................................. 6

        iii.  CLP and LPS As Methods of Inducing Sepsis in Mice .................................... 6

    C.  Plaintiff's Supplement to the AR: The Seok Study Confirms Mouse Models of Sepsis Do Not Correlate with the Human Experience ................................. 7

    D.  Plaintiff's Supplement to the AR: The NAGMSC Sepsis 2019 Final Report Confirms NIH's Appreciation of the Scientific Community's Skepticism of the Mouse Model of Sepsis ..................................................................... 8

    E.  Plaintiff's Supplement to the AR: The Sample Notice of Funding Opportunity Confirms the Peer Reviewers Did Not Meaningfully Consider the "Innovation," "Approach," and "Use-of-Animals" Metrics ........................................... 9

    F.  The Administrative Record ("AR") Defendants' Produced Does Not Rationally Support the Grant Awards ..................................................................... 10

        i.  General Considerations ................................................................... 10

        ii.  NIH Grant No. 1R21AI147168 (Principal Investigator Remick) ................... 11

        iii.  NIH Grant No. 1R21AI150723 (Principal Investigator O'Connor)................. 13

        iv.  NIH Grant No. 1R21AI152050 (Principal Investigator Tian) ........................ 14

        v.  NIH Grant No. 1R21NS121504 (Principal Investigator Aneja) ..................... 15

        vi.  NIH Grant No. 7R01AI152044 (Principal Investigator Deng) ...................... 16

    G.  The Record Demonstrates Plaintiff's Standing......................................... 17

V.  STANDARD OF REVIEW ................................................................................. 19

VI.  ARGUMENT....................................................................................................... 19

A.   Defendants' Awards of these Five Grants Were Arbitrary or Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with the Law ....................................... 20

B.   PETA is Entitled to an Injunction Prohibiting NIH's Public Funding of Sepsis Experiments on Animals Using the CLP and LPS Methods..................................... 29

VII.   CONCLUSION............................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Adamson v. Columbia Gas Transmission, LLC*, 987 F. Supp. 2d 700 (E.D. Va. 2013)......... 18, 19

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ................................................... 25

*Association of Public Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939 (9th Cir. 2013) ................................................................................................................................ 17

*Balt. Gas and Elec. Co. v. NRDC*, 462 U.S. 87 (1983) ................................................................ 20

*Blanca Telephone Company v. Federal Communications Commission*, 991 F.3d 1097 (10th Cir. 2021)........................................................................................................................... 17

*Braeburn Inc. v. United States Food & Drug Admin.*, 389 F. Supp. 3d 1 (D.D.C. 2019)............ 25

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166 (10th Cir. 2023) ........ 27

*Deese v. Esper*, 483 F. Supp. 3d 290 (D. Md. 2020) ................................................................... 22

*District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) .................................... 21

*Ergon-W. Virginia, Inc. v. United States Env't Prot. Agency*, 896 F.3d 600 (4th Cir. 2018)....... 21

*Ergon-W. Virginia, Inc. v. United States Env't Prot. Agency*, 980 F.3d 403(4th Cir. 2020)........ 21

*Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367 (2024) ..................................... 3

*Harrison v. Austin*, 597 F. Supp. 3d 884 (E.D. Va. 2022)............................................... 22, 27, 29

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................................. 3

*Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) .............................................................................. 3

*Monumental Paving & Excavating, Inc. v. Pa. Mfrs. Ass'n Ins. Co.*, 176 F.3d 794 (4th Cir. 1999) ................................................................................................................................. 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)................................................................................................................................. 21

*Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010)...................................... 19

*Northwest Environmental Defense Center v. Bonneville Power Admin.*, 117 F.3d 1520 (9th Cir. 1997)........................................................................................................................... 17

*Owner–Operator Independent Drivers Association, Inc. v. United States Department of Transportation*, 831 F.3d 961 (8th Cir. 2016) .......................................................................... 17

*PETA v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x 493 (4th Cir. 2021)................. 3

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024) .......................................................................................................................................... 3

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020.................................................... 20, 21, 22, 23

*Sierra Club v. E.P.A.*, 292 F.3d 895 (D.C. Cir. 2002) ................................................................ 17

*Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018) .................................... 20

*Sierra Club v. United States Env't Prot. Agency*, 972 F.3d 290 (3d Cir. 2020).......................... 27

*Tennessee Republican Party v. Securities and Exchange Commission*, 863 F.3d 507 (6th Cir. 2017) ................................................................................................................................. 17

*Traynor v. Turnage*, 485 U.S. 535 (1988) .................................................................................. 20

**Statutes**

42 U.S.C. § 241(a) ......................................................................................................................... 2

42 U.S.C. § 283e(a)(1)(A)-(C)....................................................................................................... 2

5 U.S.C. § 706(2)(A)..................................................................................................................... 20

iii

**Rules**

Fed. R. Civ. P. 12(b)(1)................................................................................................ 2
Fed. R. Civ. P. 12(b)(6)................................................................................................ 2

**Regulations**

42 C.F.R. § 52.5(a)...................................................................................................... 2
42 C.F.R. § 52h.8 ........................................................................................................ 2

## I.    INTRODUCTION

Sepsis is the body's extreme response to an infection. It is highly deadly. One third of patients who die in a hospital have sepsis, and sepsis affects at least 1.7 million American adults in a typical year. Even sepsis patients who do not die can suffer long-term, debilitating effects. Currently, there is no treatment for this grave condition.

The lack of treatment—despite extensive experimentation on mice for decades, including the development of 150 treatment agents that all failed when tested in human clinical trials—prompted dozens of researchers to undertake a groundbreaking, ten-year, systematic survey of the utility of experiments on mice for the study of sepsis and other inflammatory human disease (hereinafter, "Seok Study"). The Seok Study, which interrogated the deficiencies of mouse models for studying human sepsis, was published in 2013. The Seok Study outlined how fundamental differences between humans and mice cause such a poor correlation between responses to inflammation in the two species that sepsis experiments using mice were as predictive as random chance.

Despite both Defendants and some of their own carefully selected peer reviewers acknowledging experimentation on mice is a severely flawed way to study human sepsis, Defendants continue to award research grants that fund pointless and cruel sepsis experiments on mice—in complete disregard of Defendants' statutory and regulatory mandates to fund only meritorious research that reduces the use and suffering of animal test subjects. Plaintiff's complaint challenges five such NIH grants related to experimentation on mice to study human sepsis as arbitrary and capricious.

As the Administrative Record ("AR") makes abundantly clear, this case, brought under the Administrative Procedure Act ("APA"), is about government agencies blindly continuing to support specific animal experiments without any good reason for doing so. Rather than an

ideological disagreement over contradictory scientific judgments or a matter of competing expert viewpoints, the AR shows that it is Defendants themselves who have acknowledged where the science is—only to take actions that willfully ignore that uncontroverted evidence. This Court has a legal obligation to halt and correct Defendants' textbook arbitrary and capricious grant awards.

## II.    LEGAL BACKGROUND

The Public Health Service Act ("PHSA") and its implementing regulations require that Defendants only fund research that: (a) has an adequate approach and methodology (*see* 42 C.F.R. § 52h.8); (b) is innovative and original (*see id.*); (c) does not use animals, reduces the number of animals used, or reduces the pain and distress produced in animals used in experimentation (*see* 42 U.S.C. § 283e(a)(1)(A)-(C)); (d) provides adequate protection to the animals used in the experiments (*see* 42 C.F.R. § 52h.8); (e) has a likelihood of producing meaningful results (*see* 42 C.F.R. § 52.5(a)); and (f) "relat[es] to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man" (*see* 42 U.S.C. § 241(a)) (stated differently, the research must advance human medical science, as opposed to veterinary science). In short, Congress made the considered decision to prevent taxpayer dollars being funneled into pointless, painful experiments on animals by requiring Defendants to only invest in animal experimentation that minimizes animal suffering and is actually likely to translate to human treatments.

## III.    PROCEDURAL HISTORY

### A.  The Pleadings and Defendants' Dismissal Motion.

Plaintiff filed its Complaint in this matter on September 20, 2021. ECF 1. On April 21, 2022, Defendants filed a pre answer motion to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing, and, in the alternative, for failure to state a claim under Rule 12(b)(6). ECF 36. This Court partially denied Defendants' motion on March 21, 2023, expressly finding Plaintiff sufficiently pled both its standing and cognizable claims under the APA.

ECF 69.

Relying on *PETA v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x 493, 496 (4th Cir. 2021), and *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012), this Court approved the sufficiency of Plaintiff's injury-in-fact allegations:

> PETA has made plausible [allegations] that Defendants' funding of animal-involved sepsis research without regard to the applicable PHSA regulations frustrates PETA's overall mission by subjecting more animals to needless pain and suffering. PETA has necessarily expended resources in an effort to convince the agency to cease funding such studies and adhere to the applicable regulatory criteria. PETA specifically has organized public pressure campaigns against NIH, written letters to NIH officials trying to convince them to deny funding, and published literature to rectify the misperception that NIH's grants do not fund research that harms animals. Accordingly, PETA has been forced to divert resources away from other animal-protection projects in order to devote these resources to educating the public about and advocating for the cessation of animal-involved sepsis experiments.

ECF 69 at 7 (internal citations and quotations omitted).[1]

This Court also approved the sufficiency of PETA's traceability and redressability allegations, stating, "Here, the alleged injury is directly traceable to Defendants' approval of the grants because NIH funding enables the research that causes harm to animals. Accordingly, if

---

[1] The Fourth Circuit has continued to approvingly cite *PETA v. Tri-State*, and its careful parsing of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), after the Supreme Court's June 2024 decision in *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 394 (2024), explaining that while parties cannot "spend [their] way into standing," organizational standing exists when they can establish "an impediment to their advocacy similar to the impediment imposed in *Havens Realty*." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 396 (4th Cir. 2024). Nothing about this Court's legal analysis—that agency action has forced PETA to "necessarily," rather than voluntarily, ECF 69, at 7, divert funds to respond to a threat to its core mission—requires revision under prevailing Supreme Court and Fourth Circuit frameworks. Indeed, this Court's explanation of applicable organizational standing principles accurately anticipated the Supreme Court's subsequent clarification. *Id.* at 5-6 ("An organization cannot meet the injury-in-fact requirement simply because it chose to divert resources to educate its members or challenge an unlawful action in litigation, as such efforts result not from any actions taken by the defendant, but rather from the organization's own budgetary choices.").

PETA prevails in this case and obtains an injunction that restricts NIH funding of animal sepsis experiments, PETA's injury would be redressed." ECF 69 at 8. Further, this Court found PETA's alleged injury passes the zone of interest test because "PETA's interests in protecting animals are protected by the peer review requirements of the PHSA." *Id*. at 8-9 n.4.

This Court also held PETA's allegations challenging Defendants' approvals of five specific research grants stated cognizable claims because:  (1) Defendants' approvals of the specific grants constituted final agency actions (ECF 69 at 10), (2) the PHSA and its implementing regulations as a matter of law do not grant Defendants unfettered discretion but rather equip this Court with meaningful standards with which to review Defendants' grant approvals (*id*. at 11-12), and (3) PETA's allegations that Defendants disregarded fundamental deficiencies in experiments on mice to study human sepsis makes plausible that Defendants' continued funding of such experiments is arbitrary or capricious (*id.* at 14-15).

Defendants filed an Amended Answer on July 13, 2023. ECF 87.

### B.  Plaintiff's Motion to Supplement the Administrative Record.

Defendants filed the Administrative Record (the "AR") on December 13, 2023 (ECF 111) and supplemented it on April 2, 2024 (ECF 128) with peer reviewer material Defendants inadvertently omitted from the earlier filing. Plaintiff moved to supplement the AR on September 5, 2024. ECF 141. On September 22, 2025, this Court partially granted Plaintiff's motion. ECF 152.

## IV.    UNDISPUTED FACTS

### A.  Facts Defendants Admitted in the Amended Answer Confirm the Seriousness of Sepsis and that Sepsis Can Be Researched Using Non-animal Methods.

According to the Centers for Disease Control and Prevention (the "CDC"): at least 1.7 million adults in America develop sepsis in a typical year; 1 in 3 people who die in a hospital had

sepsis during that hospitalization; sepsis is the body's extreme response to an infection; and without timely treatment, sepsis can rapidly lead to tissue damage or organ failure. *See* ECF 87 at ¶¶ 2, 47-49.

The National Institutes of Health ("NIH") is the largest public funder of biomedical research in the United States of America. *Id*. at ¶ 1. NIH is responsible to Congress and the U.S. taxpayer for carrying out its mission cost-effectively and in compliance with applicable rules and regulations. *Id*. at ¶ 51. Certain institutes within NIH fund sepsis research, and some of that sepsis research uses animals. *Id*. at ¶ 1. Since fiscal year 2014, institutes within NIH have authorized funding for sepsis research involving animals in excess of $240 million. *Id*. at ¶ 65. Mice are the most commonly used non-human species in scientific research concerning sepsis. *Id*. at ¶ 66.

There are scientifically valid methods and approaches[2] to studying sepsis that do not use animals. *Id*. at ¶¶ 5, 70. For years, PETA has attempted to educate[3] NIH and its employees about the wastefulness, cruelty and ineffectiveness of certain types of experiments involving animals. *Id*. at ¶¶ 17, 19, 22, 23, 72.

Defendants awarded each of the five grants Plaintiff challenges. *Id*. at ¶¶ 77, 80, 84, 87, 92.

### B. Plaintiff's Supplement to the AR: The Declaration of Dr. Nielsen Provides Explanatory Material Confirming the Subject Experiments Are Neither Translational nor Harmless for the Animals.

Dr. Nathan Dean Nielsen ("Dr. Nielsen") is a physician, medical researcher, and professor with substantial education, training, and experience in sepsis and related subjects whom this Court ruled to be qualified to provide explanatory information to aid this Court's review, given the

---

[2] For example, non-animal "tissue chips" can be used instead. *See* Exhibit A, Declaration of Kathy Guillermo, at Exhibit 2, at PETA00002812.

[3] Many of PETA's writings to NIH on the subject are attached to the Declaration of Kathy Guillermo as Exhibit 2 thereto.

scientific and technical subject matter of this lawsuit (ECF 152 at 4).

### i.  Duty of Peer Reviewers to Avoid Conclusory Reasoning

It is generally understood and accepted within the scientific community that peer reviewers should provide comprehensive analyses of grant proposals and experimental findings, particularly when the proposals or experimental findings appear counterintuitive or contradictory to established or accepted prior findings or data trends. *See* Declaration of Dr. Nielsen (ECF 141-3 at ¶ 104).

### ii.  Types of Medical Research Generally

As a category of research, *basic* (sometimes used interchangeably with *foundational*, *fundamental*, *exploratory* or *descriptive*) is a type of scientific research with the aim of improving scientific theories for better understanding and prediction of natural or other phenomena. In the medical arena, basic research encompasses scientific disciplines such as biochemistry, microbiology, physiology, and pharmacology, and their interplay, and involves laboratory studies with cell cultures, animal studies or physiological experiments. *Id*. at ¶ 109.

As a category of research, *translational* means a discipline within biomedical and public health research that aims to improve the health of individuals and the community by "translating" findings into diagnostic tools, medicines, procedures, policies and education. *Id*. at ¶ 110.

As a category of research, *clinical* involves humans and is generally carried out to evaluate the efficacy of a therapeutic drug, a medical/surgical procedure, or a device as a part of treatment and patient management. *Id*. at ¶ 111.

### iii. CLP and LPS As Methods of Inducing Sepsis in Mice

Cecal ligation puncture (CLP) is defined as the perforation of the cecum allowing the release of fecal material into the peritoneal cavity to generate an exacerbated immune response (sepsis) induced by polymicrobial infection. *Id*. at ¶ 112. As a result of the CLP procedure, animals may experience such symptoms as widespread pain with particularly extreme abdominal pain,

fever, chills, diarrhea, difficulty breathing, lethargy, disorientation, shock, and organ- or multiple-organ failure. *Id.* at ¶ 113. CLP, the most common mouse experimental model of sepsis, induces intra-abdominal sepsis, which on average accounts for only 20-30% of human sepsis etiologies. In contrast, pneumonia (lung infection) is the predominant etiology and is believed to cause up to 60% of sepsis cases in humans. In short, the majority of experimentation that relies on mouse models of sepsis is not studying the most common cause of sepsis in humans. *Id.* at ¶ 114.

*Lipopolysaccharide* (LPS) *bacterial injection* is defined as the exogenous administration of endotoxin (LPS) to induce the release of high levels of pro-inflammatory cytokines, which can then be measured in circulating serum. *Id.* at ¶ 115. As a result of the LPS procedure, animals may experience such symptoms as widespread pain with particularly extreme chest pain, fever, chills, diarrhea, difficulty breathing, lethargy, disorientation, shock, and organ- or multiple-organ failure. *Id.* at ¶ 116. Of mammals, humans are much more sensitive to LPS than other animals. A dose of 1 µg/kg induces shock in humans, but mice will tolerate a dose up to a thousand times higher. The LPS model does not accurately reproduce the characteristic features of human sepsis, as mice used in such experiments show cytokine responses that are earlier, more severe, and shorter in duration than those in humans. *Id.* at ¶ 117.

The sepsis that results from either CLP or LPS can cause the animals who have undergone the procedure to experience severe pain, become highly debilitated and have difficulty eating, drinking, moving around, and maintaining body temperature. *Id.* at ¶ 118.

### C. Plaintiff's Supplement to the AR: The Seok Study Confirms Mouse Models of Sepsis Do Not Correlate with the Human Experience

The Seok Study explains the results of a 10-year study involving the collaboration of 39 researchers from institutions across North America, as well as international experts. ECF 141-4 at 8. The researchers compared data obtained from hundreds of human clinical patients with results

from experiments on mice to demonstrate that, when it comes to serious inflammatory conditions such as sepsis, burns, and trauma, mice have determinative differences from humans. *Id*. The researchers confirmed that, as of the time of the study, "there ha[d] been nearly 150 clinical trials testing candidate agents intended to block the inflammatory response in critically ill patients, and every one of these trials failed." *Id*. The researchers went on to conclude mouse models of sepsis were as predictive as random chance. *Id*. at 11.

Although the researchers stated that more sophisticated definitions and genomic descriptions of the development and progression of sepsis in human patients could potentially be used to improve the translatability of the animal model by artificially manipulating the animal model to make it better mimic human septic biochemistry, they also noted that more sophisticated ways to capture detailed septic biochemical data directly from human patients will likely "short circuit the need for mouse models in disease discovery and drug development." *Id*. at 12. In other words, the very hypothetical technological advances necessary to potentially make the animal model of sepsis experimentation more reliably translational could, and almost certainly would, render the animal model even more obsolete and unnecessary for developing treatments for human patients.

### D. Plaintiff's Supplement to the AR: The NAGMSC Sepsis 2019 Final Report Confirms NIH's Appreciation of the Scientific Community's Skepticism of the Mouse Model of Sepsis

The NAGMSC (National Advisory General Medical Sciences Council) Working Group on Sepsis "was convened in the Summer of 2018 to advise NIGMS [the National Institute of General Medical Sciences] leadership regarding its extramural portfolio of research grants studying fundamental and clinical aspects of sepsis." ECF 141-4 at 17. NIGMS is a component institute of NIH, and NAGMSC advises the NIGMS director on research and research policies. According to the 2019 Final Report, NIGMS provided the most financial support to sepsis researchers out of all

the component institutes of NIH that year. *Id*. In the 2019 Final Report, the NAGMSC Working

Group on Sepsis stated there is "doubt [concerning CLP's] utility in studying the majority of

human experience." *Id*. at 21.

### E. Plaintiff's Supplement to the AR: The Sample Notice of Funding Opportunity Confirms the Peer Reviewers Did Not Meaningfully Consider the "Innovation," "Approach," and "Use-of-Animals" Metrics

Defendants' Sample Notice of Funding Opportunity requires that peer reviewers should

carefully answer the following questions when evaluating a grant application for the "Innovation"

metric:

- Does the application challenge and seek to shift current research or clinical practice paradigms by utilizing novel theoretical concepts, approaches or methodologies, instrumentation, or interventions?

- Are the concepts, approaches or methodologies, instrumentation, or interventions novel to one field of research or novel in a broad sense?

- Is a refinement, improvement, or new application of theoretical concepts, approaches or methodologies, instrumentation, or interventions proposed?

- Does the design/research plan include innovative elements, as appropriate, that enhance its sensitivity, potential for information or potential to advance scientific knowledge or clinical practice?

*See* ECF 141-4 at 63.

Defendants' Sample Notice of Funding Opportunity also provides that peer reviewers

should carefully answer the following questions when evaluating a grant application for the

"Approach" metric:

- Are the overall strategy, methodology, and analyses well-reasoned and appropriate to accomplish the specific aims of the project?

- Have the investigators presented strategies to ensure a robust and unbiased approach, as appropriate for the work proposed? Are potential problems, alternative strategies, and benchmarks for

9

success presented?

- If the project is in the early stages of development, will the strategy establish feasibility and will particularly risky aspects be managed? Have the investigators presented adequate plans to address relevant biological variables, such as sex, for studies in vertebrate animals or human subjects?

*See* ECF 141-4 at 63.

Defendants' Sample Notice of Funding Opportunity also requires that peer reviewers must evaluate the use of live vertebrate animals as part of the scientific assessment according to the following five points: 1) proposed use of the animals, and species, strains, ages, sex, and numbers to be used; 2) justifications for the use of animals and for the appropriateness of the species and numbers proposed; 3) adequacy of veterinary care; 4) procedures for limiting discomfort, distress, pain and injury to that which is unavoidable in the conduct of scientifically sound research including the use of analgesic, anesthetic, and tranquilizing drugs and/or comfortable restraining devices; and 5) methods of euthanasia and reason for selection if not consistent with the AVMA Guidelines on Euthanasia. *See* ECF 141-4 at 65.

As explained below, Defendants and their peer reviewers did not meaningfully address any of these subjects when evaluating the grant applications.

## F.   The Administrative Record ("AR") Defendants' Produced Does Not Rationally Support the Grant Awards

### i.   General Considerations

Although Defendants certified an AR that exceeds 6,000 pages, Defendants' actual reasoning in support of the five grants at issue is limited to a few pages of commentary from Defendants' peer reviewers referred to as "Summary Statements." *See also* AR at 501 (defining "summary statement" as "the official NIH record and transmittal document for recommendations made by an SRG to Council regarding the evaluation of the scientific and technical merit of a

10

specific application"). It is undisputed the Defendants do not provide any rationale when notifying applicants or the public which grant applications have been approved. *See* AR at 51 (defining Notice of Award ("NOA")), 155 (explaining NOA), 2862 (NOA for Aneja application), 3404 (NOA for O'Connor application), 4012 (NOA for Remick Application), 4950 (NOA for Deng application), and 6136 (NOA for Tian application).

The peer review process is a statutorily required component of Defendants' grantmaking function "to ensure a fair, equitable, informed, and unbiased evaluation of their scientific and technical merit." AR at 416-17. Defendants engage peer reviewers prior to the award of a grant to produce an "assessment of the likelihood for the project to exert a sustained, powerful influence on the research field(s) involved." *Id*. at 89. The reviewers score each application across 5 metrics: the significance of the public health problem the research seeks to address ("Significance"); the reputation and competence of the investigators ("Investigator(s)"); the novelty of the proposed research ("Innovation"); the logic of the experimental design ("Approach"); and the reputation and resources of the institution at which the research will take place ("Environment"). *Id*. On each metric, the best possible score is "1" and the worst possible score is "9." *Id*. at 416. Reviewers are also required to take into consideration the proposed treatment of "Vertebrate Animals," though they do not give a score for this subject. *Id*. at 90. These metrics correspond to Defendants' legal mandates to fund only innovative experiments with a sound approach and methodology performed by qualified investigators and institutions, that minimize the suffering inflicted on animals used in experiments or avoid using animals completely, and that are likely to advance the development of treatments for human conditions.

### ii.  NIH Grant No. 1R21AI147168 (Principal Investigator Remick)

The Remick application proposed to replicate and validate, using a mouse model of CLP-induced sepsis, a small clinical trial that demonstrated a significant reduction in mortality in septic

patients with a certain "triple therapy" consisting of a combination of vitamin C, thiamine, and hydrocortisone ("HAT"), and to investigate the mechanism underlying the beneficial efficacy of the triple therapy. *See* AR at 1771.

The peer reviewers gave the Remick application the following scores:

| Reviewer No. | Significance Score | Investigator Score | Innovation Score | Approach Score | Environment Score |
|---|---|---|---|---|---|
| 1 | 9 | 1 | 8 | 5 | 1 |
| 2 | 2 | 2 | 3 | 3 | 2 |
| 3 | 2 | 1 | 2 | 3 | 1 |

In the Summary Statements, the peer reviewers noted the following weaknesses in the Remick application, even after Remick resubmitted the application to address other theoretical and experimental-design weaknesses the peer reviewers noted after reviewing a prior version of the application:

A. "The clinical evidence base supporting the necessity of HAT combination therapy is weak." *See* AR at 3530;

B. "The significant methodological limitations of such an observational study raises [sic] concerns about the scientific premise—that there is significant and specific benefit of combination therapy in humans . . . While this concern does not exclude the importance of the study, it does increase the risk that findings may have limited relevance." *Id.*;

C. "[T]he proposed experiments do not inform causality, limiting the impact of the experimental approach." *Id.* at 3531;

12

D.  The disproportionately massive dosage of the HAT combination therapy given to mice "limits the applicability of the model to humans." *Id*.

E.  "[T]he timing of the grant might be premature as the outcomes of the ongoing HAT clinical trials is [sic] not available." *Id*. at 3533.

F.  "Differences in response of male and female mice are presented but there is no discussion of whether differences are expected in response to therapy." *Id*. at 3535.

### iii. NIH Grant No. 1R21AI150723 (Principal Investigator O'Connor)

The O'Connor application proposed to examine the role of mesothelial cells in regulating inflammatory responses to surgical disruption and endotoxin (LPS)-induced inflammation, and to test the hypothesis that specialized mesothelial cells transmit anti-inflammatory signals to the spleen via cholinergic alpha 7 nicotinic receptor signaling. *See* AR at 2961. The theory is that surgical disruption of the mesothelial cells will aggravate inflammation, while manipulating the cells in certain ways will mitigate inflammation.

The peer reviewers gave the O'Connor application the following scores:

| Reviewer No. | Significance Score | Investigator Score | Innovation Score | Approach Score | Environment Score |
| --- | --- | --- | --- | --- | --- |
| 1 | 2 | 2 | 2 | 3 | 2 |
| 2 | 3 | 3 | 1 | 3 | 3 |
| 3 | 1 | 1 | 1 | 2 | 1 |

In the Summary Statements, the peer reviewers noted the following weaknesses in the O'Connor application:

13

a. "[T]he approach could be strengthened using a more clinically relevant sepsis model with an improved power calculation of animal numbers in each group." *See* AR at 2961;

b. LPS alone might not be sufficient "to fully appreciate the role of mesothelial cells of the spleen." *Id*; and

c. "The investigators [applicants] suggest that the findings are relevant to sepsis, but that is not explored here." *Id*. at 2967.

### iv.  NIH Grant No. 1R21AI152050 (Principal Investigator Tian)

The Tian application proposed to induce sepsis in mice via LPS bacterial injection and CLP, to explore the role of RNA methylation in regulating inflammatory response in sepsis, and to explore the interaction between MALAT1 and the key enzymes for RNA methylation in regulating inflammation in sepsis. *See* AR at 2352-53. The central hypothesis is that a long noncoding RNA (IncRNA), MALAT1, interacts with an RNA ethylation enzyme, METTL16, to stimulate the methylation of the methionine adenosyltransferase (MAT2A), which is known to promote metabolism and the immune response.

The peer reviewers gave the Tian application the following scores:

| Reviewer No. | Significance Score | Investigator Score | Innovation Score | Approach Score | Environment Score |
|---|---|---|---|---|---|
| 1 | 4 | 2 | 2 | 5 | 2 |
| 2 | 3 | 3 | 3 | 3 | 2 |
| 3 | 3 | 2 | 1 | 5 | 2 |

In the Summary Statements, the peer reviewers noted the following weaknesses in the Tian application, even after Tian resubmitted the application to address other theoretical and

14

experimental-design weaknesses the peer reviewers noted after reviewing a prior version of the application:

a. "There is no technique novelty in the proposed experiments." *See* AR at 5635;

b. "Some preliminary data look like not [sic] perform appropriate statistical analysis." *Id.*; and

c. "Some minor concerns exist [about the relevance and translatability of the experiments]" given "CLP usually only produces mild airspace inflammation in mice," rendering the lung injury induced by non-pulmonary sepsis in mice not very analogous to the corresponding injury in human septic patients. *Id.* at 5639.

### v. NIH Grant No. 1R21NS121504 (Principal Investigator Aneja)

The Aneja application proposed to study sepsis-induced brain injury by inducing sepsis in mice via CLP and then testing the extent to which application of a "Sur1-Trpm4 inhibitor" prevents or mitigates sepsis-induced brain damage.

The peer reviewers gave the Aneja application the following scores:

| Reviewer No. | Significance Score | Investigator Score | Innovation Score | Approach Score | Environment Score |
|---|---|---|---|---|---|
| 1 | 1 | 2 | 3 | 3 | 1 |
| 2 | 3 | 3 | 3 | 4 | 1 |
| 3 | 3 | 3 | 3 | 3 | 2 |

In the Summary Statements, the peer reviewers noted the following weaknesses in the Aneja application:

a. "concern about the unclear translatability of the CLP sepsis mouse model." *See* AR at 2733;

15

b. "[n]o translatable clinical aims in future" and "CLP model of sepsis not novel." *Id*. at 2735;

c. "Enthusiasm is dampened by the sepsis model (cecal ligation and puncture), which might not be of translational relevance in humans; the NAGMSC Working Group on Sepsis report to the NIGMS brings into question the utility of this model." *Id*. at 2737;

d. "[C]ecal ligation/puncture, although a standard experimental model for sepsis, has been subject to concern and scrutiny relating to translatability and robustness." *Id*. at 2738.

### vi. NIH Grant No. 7R01AI152044 (Principal Investigator Deng)

The Deng application proposed to explore the role fibroblastic reticular cells (FRCs) play in the body's response to infection and identify ways to improve the effectiveness of FRCs in combating sepsis by inducing sepsis in mice via CLP and then testing the effectiveness of several types of injected FRCs—both murine and human—in various conditions of infection. More specifically, Deng hypothesizes that cellular receptor "TLR9" is the cell feature that makes FRCs effective at combating infection.

The peer reviewers gave the Deng application the following scores:

| Reviewer No. | Significance Score | Investigator Score | Innovation Score | Approach Score | Environment Score |
|---|---|---|---|---|---|
| 1 | 2 | 2 | 2 | 3 | 1 |
| 2 | 2 | 2 | 3 | 5 | 2 |
| 3 | 2 | 2 | 2 | 4 | 1 |

16

In the Summary Statements, the peer reviewers noted the following weaknesses in the Deng application, even after Deng revised the application to address other theoretical and experimental-design weaknesses the peer reviewers noted after reviewing a prior version of the application:

    a.  "[T]here remain some minor concerns about the lack of preliminary data to demonstrate the validity of the E. coli peritonitis model [and] the unclear rationale of using two CLP models with different severity." *See* AR at 4307;

    b.  "As non-pulmonary sepsis often induces only minimal histologic lung injury and kidney injury (Lee et al. Crit Care Med 2012) in mice, the proposed studies will be insensitive to FRC-mediated changes in septic organ injury." *Id.* at 4311;

    c.  "[T]his application [is not supported by] preliminary data demonstrating that sepsis can be indeed modeled using the proposed approach." *Id.*;

    d.  "The rationale for using two models of CLP with different severity is not justified." *Id.* at 4315; and

    e.  "The LPS model does not mimic gram negative bacterial induced peritonitis and numerous studies have demonstrated that LPS produces opposite results compared to CLP models and needs to be considered." *Id.*

### G. The Record Demonstrates Plaintiff's Standing4

PETA's core non-profit mission requires it to provide for animals in need and to provide

---

[4] In cases such as this in which an APA plaintiff's standing was not addressed by the defendant agency and therefore evidence of the issue does not appear in the AR, the plaintiff may prove its standing via affidavit at the summary judgment phase. *See, e.g.*, *Sierra Club v. E.P.A.*, 292 F.3d 895 (D.C. Cir. 2002); *Northwest Environmental Defense Center v. Bonneville Power Admin.*, 117 F.3d 1520 (9th Cir. 1997); *Association of Public Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939 (9th Cir. 2013); *Blanca Telephone Company v. Federal Communications Commission*, 991 F.3d 1097 (10th Cir. 2021); *Tennessee Republican Party v. Securities and*

resources to assist people interested in voluntarily refraining from otherwise *legal* activity that hurts animals. *See* Declaration of Kathy Guillermo dated December 17, 2025 ("Guillermo Decl."), Exhibit A, at ¶ 6. PETA was compelled to divert resources because of the Defendants' illegal funding decisions, which posed a direct threat to its core organizational mission. *Id*. at ¶ 7. Illegal animal experimentation creates *more* animal suffering, as well as public confusion about the distinction between legal and illegal animal testing, which frustrates PETA's core mission and requires it to divert resources from its core mission-advancing business activities focusing on legal conduct that nonetheless harms animals in order to address the deleterious effects of the illegal conduct. *Id*. at ¶ 10. PETA has had to divert the working time of at least 25 employees of PETA or its affiliate the PETA Foundation to addressing Defendants' illegal funding of sepsis experiments on animals. *Id.* at ¶¶ 16 and 17. Those employees would have otherwise used that time to perform job duties focusing on legal conducting affecting animals, consistent with PETA's core mission. *Id*. at ¶ 18. PETA has also had to incur travel costs and printing costs addressing Defendants' conduct. *Id*. at ¶ 20.

This Court has already recognized the expenses sworn to in the Guillermo Declaration as cognizable and sufficient to support standing. ECF 69 at 7 ("PETA specifically has organized public pressure campaigns against NIH, written letters to NIH officials trying to convince them to deny funding, and published literature to rectify the misperception that NIH's grants do not fund experiments that harms animals. Accordingly, PETA has been forced to divert resources away from other animal-protection projects in order to devote these resources to educating the public about and advocating for the cessation of animal-involved sepsis experiments. This is precisely the sort

---

*Exchange Commission*, 863 F.3d 507 (6th Cir. 2017); *Owner–Operator Independent Drivers Association, Inc. v. United States Department of Transportation*, 831 F.3d 961 (8th Cir. 2016).

of mission-driven diversion of resources that the Fourth Circuit found sufficient to establish an organizational injury in *Tri-State*") (internal citations and quotations omitted).

## V.      STANDARD OF REVIEW

"The standard of review for cross motions for summary judgment is well settled in the Fourth Circuit." *Adamson v. Columbia Gas Transmission, LLC*, 987 F. Supp. 2d 700, 703 (E.D. Va. 2013). When considering cross-motions for summary judgment, a district court should consider "each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." *Id.* (quoting *Monumental Paving & Excavating, Inc. v. Pa. Mfrs. Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999)). Under the Rule 56 standard, "[s]ummary judgment is appropriate only if the record 'shows there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Id.* (quoting *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010)). "A 'genuine' issue concerning a 'material' fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable [trier of fact] to return a verdict in that party's favor." *Id.*

## VI.     ARGUMENT

Defendants do not explain their reasoning in the formal Notices of Award ("NOA") they send to successful applicants or in any other writing. Thus, Defendants cannot dispute the "Summary Statements" memorializing Defendants' peer reviewers' assessment of the research grant applications are the only places where anything remotely resembling a rationale for a funding decision might be found. The Summary Statements for the five grants at issue in this case are conclusory and woefully inadequate. However, even these limited conclusory statements acknowledge that the methods of inducing sepsis in mice proposed in the subject experiments are viewed with skepticism by the scientific community, and that that methodological problem severely reduces the likelihood the experiments will produce information helpful to treating human

19

sepsis. The Summary Statements are devoid of any reasoning explaining how the proposals mitigate or overcome such a serious methodological problem or are otherwise meritorious.

The APA requires Defendants to show their work, which Defendants simply did not do. However, even if they tried, they would have failed because there is no work they could show that could rationally support these experiments. Non sequiturs and conclusory statements cannot justify or explain an agency's reliance on bad or outdated science. *See Roe v. Dep't of Def.*, 947 F.3d 207, 217 (4th Cir. 2020). Because the Administrative Record in this case clearly does not support the rationality of the five challenged grant awards, this Court can, and should, find these actions to be arbitrary and capricious, and accordingly grant summary judgment for the Plaintiff.

### A. Defendants' Awards of these Five Grants Were Arbitrary or Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with the Law

The Supreme Court has "repeatedly acknowledged the strong presumption that Congress intends judicial review of administrative action." *Traynor v. Turnage*, 485 U.S. 535, 542 (1988) (internal citations and quotation marks omitted). This Court already approved the sufficiency of PETA's allegation that each of the five grant awards constitutes a final agency action (*see* ECF 69 at 10), and Defendants do not dispute making the awards (*see* ECF 87 at ¶¶ 77, 80, 84, 87, 92). Additionally, this Court has already held as a matter of law that the PHSA and its regulations do not grant Defendants unfettered discretion but instead equip this Court with meaningful standards to apply to review the Defendants' actions. *See* ECF 69 at 12. Accordingly, the only question now before this Court is whether the content of the AR provides a rational basis for the five grant awards. It does not.

The APA states that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary-or-capricious review is "searching

and careful," *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 270 (4th Cir. 2018) (citation and quotation marks omitted), determining if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." To prevail, Plaintiff must prove Defendants' funding decisions fell outside "the bounds of reasoned decisionmaking." *Balt. Gas and Elec. Co. v. NRDC*, 462 U.S. 87, 104 (1983). Plaintiff may do this by showing Defendants "entirely failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard applies with particular force to agencies' scientific determinations. Agencies do not have "free rein to use inaccurate data" and must examine relevant data, which examination could reveal that the figures being used are erroneous. *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56 (D.C. Cir. 2015). Moreover, agencies cannot "ignore new and better data" and have "an obligation to deal with newly acquired evidence in some reasonable fashion." *Id*. at 57; *see also Ergon-W. Virginia, Inc. v. United States Env't Prot. Agency*, 896 F.3d 600, 601 (4th Cir. 2018) (holding it is arbitrary and capricious for an agency to rely on a facially flawed report of other agencies or professionals); *Ergon-W. Virginia, Inc. v. United States Env't Prot. Agency*, 980 F.3d 403, 406 (4th Cir. 2020) (holding it is arbitrary and capricious for an agency to inconsistently apply its own standards when performing its review function).

The Fourth Circuit and this district have found an agency's action can be arbitrary or capricious if it is contrary to current science and utterly fails to account for the discrepancy. In *Roe v. Dep't of Def.*, 947 F.3d 207, 217 (4th Cir. 2020), as amended (Jan. 14, 2020), two members of the Air Force filed an APA lawsuit to enjoin their discharge based on their HIV-positive status and

to prohibit the enforcement of military "policies in a manner that limits the deployability of servicemembers diagnosed with HIV." The court found there were two agency actions at issue: "the Government's policies regarding deployment of HIV-positive servicemembers, and the Air Force's decisions to discharge [plaintiffs and others]." *Id.* at 219. The Fourth Circuit found the plaintiffs "likely to succeed on their claim that the deployment policies at issue violate the APA because the Government has not—and cannot—reconcile these policies with current medical evidence." *Id.* at 220. Examining the administrative record, the court found that the government's proffered justifications "fail to account for current medical literature and expert opinion," *id.* at 226, and that "the military's own research undermines the Government's purported" justification, *id.* at 227. The court stated that "[a]ny understanding of HIV that could justify this ban is outmoded and at odds with current science. Such obsolete understandings cannot justify a ban, even under a deferential standard of review and even according appropriate deference to the military's professional judgments." *Id.* at 228 (determining in consideration of preliminary injunction that "Plaintiffs are likely to succeed in demonstrating the Government acted arbitrarily and capriciously . . . by imposing an unjustified deployment policy at odds with modern science").

Based on the Fourth Circuit's guidance, the district court granted summary judgment to the *Roe* petitioners. *See Harrison v. Austin*, 597 F. Supp. 3d 884, 915 (E.D. Va. 2022) ("In sum, there is no genuine issue of material fact regarding any of the bases on which the government seeks to distinguish the Fourth Circuit's forceful, unanimous opinion in *Roe*. As a result, the plaintiffs in *Roe* have established that the military's categorical bar to the deployment of asymptomatic HIV-positive service members with an undetectable viral load is not rational and that their individual discharge decisions based on that deployment bar were arbitrary and capricious"). *See also Deese*

22

*v. Esper*[5], 483 F. Supp. 3d 290, 308 (D. Md. 2020) (allowing challenge to Navy's HIV policies to "proceed on the grounds that the categorical bar [against commissioning HIV-positive individuals] violates the APA because it does not properly account for the current state of medical science").

In this case, Defendants and their peer reviewers inexplicably approved each of the five grants despite expressly acknowledging, among other serious issues, that:

- The Remick Application suffered from "significant methodological limitations" that "limit[] the applicability of the model to humans" (AR 3530-31);

- The O'Connor Application was in need of "a more clinically relevant sepsis model" than LPS (AR 2961) which detrimentally affected the "relevan[ce] to sepsis" (AR 2967);

- The Tian Application lacked "technique novelty" (AR 5635) and is unlikely to be translatable given "CLP usually only produces mild airspace inflammation in mice," rendering the lung injury induced by non-pulmonary sepsis in mice not very analogous to the corresponding injury in human septic patients (AR 5639);

- The Aneja Application has little chance of being translational due to the overreliance on the CLP model which is "not novel" (AR 2733) and of questionable "utility" (AR 2737); and

- The Deng Application provides no data to suggest "that sepsis can be indeed modeled using the proposed approach" (AR 4311), and the proposed use of CLP "is not justified" (AR 4315).

Defendants' support for the applicants' use of the CLP or LPS mouse models in sepsis experiments—despite the Seok Study and the NAGMSC Working Group on Sepsis report

---

[5] The parties in *Deese* reached a settlement prior to the summary judgment phase.

undermining those models—is just as irrational as the military discriminating against HIV positive servicemen despite advancements in HIV treatments that substantially reduce the risk of battlefield HIV communications or complications. *See Roe*, 947 F.3d 207 (4th Cir. 2020). Now that the Seok Study exists (and has even been acknowledged as meritorious by Defendants and Defendants' own carefully selected peer reviewers), Defendants have a statutory and regulatory duty to meaningfully consider its conclusions and implications for sepsis research, beyond mere lip service.

Although the Summary Statements purport to list the "strengths" of each application with respect to the "Innovation" and "Approach" metrics, the "strengths" listed are much too conclusory, vague, or downright illogical to counterbalance the clear weaknesses the peer reviewers articulated on those metrics. For some (non-exhaustive) examples:

- One peer reviewer says the Remick Application has a strength on the Innovation metric because stratifying mouse subjects of the CLP model by live/die criteria improves the clinical relevance of the CLP model, but then immediately self-contradicts by categorizing it as a weakness that Remick has attempted this very stratification before in prior experiments (AR 3534);

- Despite acknowledging upfront that "the approach [of the O'Connor Application] could be strengthened using a more clinically relevant sepsis model" (AR 2961), not a single one of the three peer reviewers explain how the Approach metric strengths they list redeem this fundamental flaw of the application (*see* AR 2963, 2966, 2968);

- One peer reviewer says the Tian Application is strong on the Innovation metric simply because it "could" result in a treatment for sepsis, without any elaboration

whatsoever why the work is actually new or likely to be fruitful (AR 5635), and then immediately goes on to self-contradict by stating the application is weak because it lacks "technique novelty" (AR 5635);

- A peer reviewer for the Aneja Application says it is strong on the Approach metric because it might have translational relevance because both humans and mice can be subjects of neuroimaging, but then immediately self-contradicts by acknowledging the use of CLP will undermine any translatability (AR 2738);

- Without providing any explanation whatsoever, a peer reviewer for the Deng Application states the proposal is strong on the Innovation metric simply because "the investigations and hypotheses are novel" (AR 4310).

Furthermore, with respect to the proposed use of vertebrate animals, the Summary Statements simply assert in a conclusory manner that ("yes") the applicants addressed all the criteria, without a single word of analysis. *See* AR 2736, 2738, 2740, 2963-4, 2966, 2968, 3532, 3535, 3536, 4312, 4315, 4317, 5635-6, 5638, and 5639. The Summary Statements improperly reduce this extremely complicated evaluation of the proposed use of animals to a yes-or-no question despite Defendants' own Sample Notice of Funding Opportunity providing them specific issues to consider regarding the proposed use of animals. ECF 141-4 at 65. Conclusory assertions, non sequiturs, and self-contradictions are classic signs of arbitrary and capricious decisions. *See, e.g.*, *Braeburn Inc. v. United States Food & Drug Admin.*, 389 F. Supp. 3d 1, 28 (D.D.C. 2019) ("To survive the judicial scrutiny that the APA requires, an agency decision itself must be reasonable and reasonably explained. Agency action fails that standard if it exhibits internally inconsistent reasoning.") (internal citation and quotations omitted); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("conclusory statements will not do; an agency's statement must be one of reasoning")

25

(internal citations and quotations omitted). Defendants and their peer reviewers' reliance on these shortcuts while not meaningfully acknowledging conflicting data and inconvenient truths is particularly troubling given peer reviewers' responsibility to "provide comprehensive analyses of grant proposals and experimental findings, particularly when the proposals or experimental findings appear counterintuitive or contradictory to established or accepted prior findings or data trends." ECF 141-3 at ¶ 104.

PETA's argument—that Defendants' actions, at best, depend on outmoded justifications contrary to modern science—is entirely supported by the record in this case. Defendants and their peer reviewers did not thoroughly discuss what, if anything, about the novelty, methodology, or proposed treatment of animals redeemed the grant applications' many weaknesses on those metrics. Defendants, through some of their peer reviewers, acknowledge the serious concerns raised by both the Seok Study and the NAGMSC Sepsis Final Report, but fail to include anything in the Summary Statements or AR generally that explains why those serious concerns about using CLP or LPS to study sepsis in mice are sufficiently mitigated by the specific experiments proposed in the applications. This failure is baffling given the existence of the Sample Notice of Funding Opportunity that lists numerous detailed questions peer reviewers should consider with respect to the Innovation and Approach metrics in particular. The AR does not present any clear evidence of the peer reviewers meaningfully engaging with those questions and issues.

Rather than provide a rational explanation of why the proposed experiments in the subject grant applications are likely to be fruitful despite the fundamental flaws of using CLP and LPS to study sepsis in mice, Defendants simply rubberstamp their peer reviewers' arbitrary application scores and conclusory approval of the grants. Defendants' hasty and conclusory reasoning in support of these five grants is especially troubling given Defendants' obligations to minimize

26

suffering to vertebrate animals, and the undisputed facts that CLP and LPS "can cause the animals who have undergone the procedure to experience severe pain, become highly debilitated and have difficulty eating, drinking, moving around, and maintaining body temperature."  ECF 141-3 at ¶ 118.  It is beyond dispute that Defendants must consider the justification for the proposed use of the animals. Given the Summary Statements fail to explain what redeems the proposed experiments despite the acknowledged severe flaws of the applications, the record supports neither the notion the experiments have a likelihood of improving human health, nor the notion the proposed use of animals in each experiment is justifiable, given the use of CLP and LPS are acknowledged by both modern science and Defendants themselves to be ineffective and non-translational methods of using mice to study human sepsis. *See, e.g.*, *Harrison*, 597 F. Supp. 3d at 908 (E.D. Va. 2022) (granting summary judgment to plaintiffs because the government's arguments concerning the likelihood of HIV transmission amongst deployed service members "remain either contradicted by scientific evidence or unsupported by the record").

In short, conclusory statements are never sufficient to meet an agency's obligations to show their work, engage in rational decision making, and reasonably address all important aspects of the problem. *See, e.g.*, *Harrison*, 597 F. Supp. 3d at 908 (E.D. Va. 2022); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023) ("Conclusory statements regarding impacts without adequate discussion do not meet the required 'hard look' under NEPA"); *Sierra Club v. United States Env't Prot. Agency*, 972 F.3d 290, 298 (3d Cir. 2020) (explaining that an agency acts arbitrarily and capriciously when it offers only a conclusory statement on an important aspect of the problem because that is functionally no different from not discussing that aspect of the problem at all).

At best, the Summary Statements in the AR suggest the peer reviewers ultimately

27

supported the applications because of how badly an effective treatment for human sepsis is needed (the "Significance" metric) and their personal esteem for the grant applicants and host institutions (the "Investigator" and "Environment" metrics). But even if the applicants made strong showings on those metrics, that does not justify absent or conclusory analysis regarding the novelty of the proposed research (the "Innovation" metric), the logic of the experimental design (the "Approach" metric), and the proposed use of animals. If that were the case, then Defendants could fund research that is objectively redundant, illogical, gratuitously cruel, and has no chance of translation to actual human treatments, just because the applicant has an otherwise good reputation, is affiliated with a legitimate institution, or claims to be attempting to address a health problem that severely affects many people. That cannot possibly be the case, as that would render the Innovation, Approach, and use-of-animals metrics, and the statutory and regulatory *mandates* on which they are based, merely *optional*. The law does not permit Defendants to fund junk science based on a mere hope that flooding the field will produce something useful. That sort of wishful thinking is antithetical to not only the scientific method, but also the APA.

Under the APA, agencies are required to show their work at least enough to allow a court to understand how the agency reasoned its way to its conclusion. Here, the AR is clear Defendants did not even attempt to do that. The undisputed theoretical problems with CLP and LPS are important aspects of the problem that Defendants paid lip service to but then failed to meaningfully consider at all, instead merely gesturing at the problem with non sequiturs and conclusory statements.

Despite producing an Administrative Record in excess of 6,000 pages, Defendants cannot point to anything before this Court that makes sense of why the Defendants and their peer reviewers awarded these five grants despite expressly acknowledging the severe weaknesses of

the proposals on the Innovation, Approach, and proposed use of animals metrics. Conclusory statements and non sequiturs are insufficient to fulfill Defendants' obligation to consider all significant aspects of the problem. Precedent in this Circuit is clear that administrative agencies may not simply ignore or pay lip service to contrary science. But that is exactly what Defendants have done. Because the AR does not disclose any chain of reasoning supporting the grants, Defendants acted arbitrarily, capriciously, in an abuse of discretion, or otherwise not in accordance with the law. The APA exists to halt and correct exactly this kind of errant conduct. Accordingly, this Court should grant summary judgment to the Plaintiff.

### B. PETA is Entitled to an Injunction Prohibiting NIH's Public Funding of Sepsis Experiments on Animals Using the CLP and LPS Methods

This Court has already observed that, in light of the allegations of the Complaint, an injunction that restricts NIH funding of animal sepsis experiments would redress PETA's injury. *See* ECF 69 at 8. Given the problems with the CLP and LPS methods that even Defendants acknowledge, the restriction should be focused on banning those methods in sepsis experiments on animals. An injunction so worded would provide Plaintiff the relief to which it is entitled, while also leaving Defendants reasonable alternatives for continuing to research sepsis. *See generally Harrison*, 597 F. Supp. 3d at 915–16 (E.D. Va. 2022) ("the Court finds that the proper remedy is a permanent injunction enjoining defendants from: (1) categorically barring the worldwide deployment of asymptomatic HIV-positive service members with undetectable viral loads based on their HIV-positive status; (2) denying applications by Harrison and any other HIV-positive service members with undetectable viral loads to commission as officers based on their HIV-positive status; and (3) discharging or otherwise separating Roe, Voe, and any other asymptomatic HIV-positive service members with undetectable viral loads based on their HIV-positive status."). If Defendants are prohibited from funding sepsis experiments on animals that uses CLP or LPS,

then PETA will no longer have to divert its organizational resources from its core mission-advancing business activities to address the harm to animals and public misimpressions caused by such illegal use of taxpayer dollars in contravention of the Public Health Service Act and its implementing regulations. *See* Exhibit A, Guillermo Decl., ¶¶ 24 and 25.

## VII. CONCLUSION

For all of the reasons set forth herein, Plaintiff PETA is entitled to summary judgment and a permanent injunction prohibiting Defendants from funding sepsis experiments that uses CLP or LPS to induce sepsis in animal test subjects.

Date: December 17, 2025

Respectfully submitted,

*/s/ Gregory D. Grant*

Gregory D. Grant, Esq. (MD Bar # 13942) SHULMAN ROGERS, P.A.
12505 Park Potomac Avenue, Sixth Floor
Potomac, Maryland 20854
Telephone: (301) 230-5200
Facsimile: (301) 230-2891
Email:
ggrant@shulmanrogers.com

Aaron T. Frazier (*pro hac vice*) PETA FOUNDATION
501 Front St. Norfolk, VA 23510
Telephone: (757) 622-7382
Facsimile: (757) 622-0457
Email: aaronf@petaf.org

*Counsel for Plaintiff*

30

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 17th day of December, 2025, I caused a copy of the foregoing *Motion, Memorandum of Law, and Proposed Order* to be electronically served via the Court's CM/ECF system on all parties and counsel receiving electronic notices in this case.

*/s/ Gregory D. Grant*
Gregory D. Grant